950 A.2d 270

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Jose PAGAN, Appellant.**

Supreme Court of Pennsylvania.

Argued April 4, 2006.

Resubmitted Jan. 11, 2008.

Decided June 17, 2008.

70

74

Mitchell S. Strutin, Philadelphia, Strutin & Smarro, for Jose Pagan, appellant.

Amy Zapp, Hugh J. Burns, Jr., Philadelphia Dist. Attorney's Office, for the Com. of PA, appellee

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD and McCAFFERY, JJ.

76

## OPINION

Chief Justice CASTILLE.*

This is a direct appeal from the imposition of two sentences of death arising out of appellant's two convictions for first degree murder (18 Pa.C.S. § 2502(a)), and lesser sentences imposed for his convictions for two counts of robbery (18 Pa.C.S. § 3701), and single counts of criminal conspiracy (18 Pa.C.S. § 903), and possessing an instrument of crime (18 Pa.C.S. § 907). Because we find no merit to the issues appellant raises, we affirm the judgments of sentence.

On the morning of January 11, 1991, the Philadelphia police were summoned to 4741 North Third Street by Irma Santiago and her sister, Lillian. The two women had noticed that the gate and front door of the house their father, Pablo Padilla, Sr. ("Padilla, Sr."), shared with their brother, Pablo Padilla, Jr. ("Padilla, Jr.") were open. When they entered the home, they immediately noticed that it had been ransacked. Irma found her father laying on the living room floor with a blanket over his head. She removed the blanket and saw duct tape over her father's eyes and mouth and a large pool of blood on the floor. Lillian ran outside to call the police.

Philadelphia police officer Roman Gadomski received a radio call requesting that he report to the 4700 block of North Third Street where he was met by Irma. After speaking with Irma, Officer Gadomski entered the Padilla home. He found Pablo Padilla, Sr. lying on the living room floor in a pool of blood and ascertained that Padilla, Sr. had no vital signs and his skin was ice cold. Officer Gadomski observed that Padilla, Sr. had suffered a gunshot wound and called the Homicide Unit. Shortly thereafter, Officer Gadomski's supervisor arrived, and together they searched the rest of the home. In the basement, Officer Gadomski found the body of Pablo Padilla, Jr. on the floor with his wrists taped together, his legs tied together with a scarf, and a kitchen knife driven into the back of his neck. Further investigation revealed that the entire house had been ransacked with cupboards and drawers opened and

* This matter was reassigned to this author.

rifled through and mattresses overturned. There was no sign of forced entry.

The homicide detective assigned to the case testified that when he arrived at the scene approximately two hours after the initial police arrival, he found Padilla, Sr.'s body on the living room floor with duct tape wrapped around his head and wrists, a blue and white nylon cord around his neck, and a gunshot wound to the upper right side of the back of his head. Items found near Padilla, Sr.'s body included a spent .32 caliber shell casing, Padilla, Sr.'s wallet with its contents strewn about, and a photograph of Padilla, Sr. with a woman later identified as Rosemary Santiago, which had been ripped into four pieces. An autopsy determined that Padilla, Sr. had been shot at close range and died from a gunshot wound to the head.

In the basement, the detective found that duct tape had been wrapped around Padilla, Jr.'s head, eyes, mouth, and hands, a piece of cloth tied his legs together, and a blue and white cord was tied around his neck. A metal ice pick had been driven into Padilla, Jr.'s skull and a large kitchen knife had been thrust through his neck from the front to the back. An autopsy revealed lacerations and abrasions on Padilla, Jr.'s face, consistent with being struck with a fist or a foot clad in an athletic shoe. There were also abrasions on Padilla, Jr.'s knees consistent with injuries one would suffer upon "waddling" across a carpeted floor on one's knees while tied. A metal ice pick was found buried almost five inches into his skull. The medical examiner testified that this injury would have caused a great deal of pain but would not necessarily have caused immediate unconsciousness or death. The medical examiner testified that the injury from the kitchen knife thrust through Padilla, Jr.'s neck would also have caused pain and, eventually, death. There was also evidence that Padilla, Jr. had been strangled by the cord around his neck, and that the pressure on the cord had been released at least once after the initial strangulation. The medical examiner was unable to determine whether Padilla, Jr. would have been conscious after being strangled or whether the pressure was reapplied

and eventually resulted in death. There was no evidence that Padilla, Jr. struggled against his taped arms or tied legs. It was not possible for the medical examiner to determine the order in which the injuries were inflicted or whether Padilla, Jr. was conscious when any particular injury occurred.

Appellant was not arrested until some months later, on April 30, 1991. When the police learned that appellant was likely located in a garage at Ninth and York Streets in Philadelphia, they sent a team with an arrest warrant to apprehend him. Appellant and another man were arrested after running out the back of the garage.

At trial, Roberto Gonzalez was a key witness for the prosecution. Gonzalez has a hearing disability and problems remembering dates and times. Gonzalez testified that appellant lived with him for two weeks in April 1991, immediately prior to appellant's arrest. According to Gonzalez, appellant's mother had requested that Gonzalez allow appellant to live with him. During the second week, appellant told Gonzalez that: (1) he "did the murders at Fifth and the Boulevard near the Dunkin' Donuts;" (2) the Homicide Unit of the Philadelphia Police Department was looking for him; (3) he and two other men had broken into the Padilla home and wrecked the house searching for something; (4) appellant and his two accomplices found the son (Padilla, Jr.) upstairs and dragged him to the basement; (5) while the two accomplices stayed with Padilla, Jr. in the basement, appellant searched the house and found money and drugs; (6) after finding the drugs and money, appellant told the other two perpetrators "we got paid;" (7) Padilla, Sr. entered the house as appellant and the two accomplices were leaving; and (8) the men grabbed Padilla, Sr. and appellant killed him. Additionally, Gonzalez testified that he had seen appellant in a van that matched the description of Padilla, Sr.'s van "back in January about the time he had all the money" and that appellant had purchased two cars in January. N.T. 11/17/92 at 150–56, 170–71.

Gonzalez also testified that sometime in December of 1990 he was walking with appellant near the corner of Fourth and Diamond Streets in Philadelphia when appellant was ap-

proached by a man in a black Mercedes. Appellant indicated to Gonzalez that the driver of the car had offered appellant $10,000 to kill a man who had stolen drugs from the driver. Appellant told Gonzalez that the driver had asked Padilla, Sr. to return the money or the drugs, and Padilla, Sr. had declined. *Id.* According to Gonzalez, appellant indicated that his subsequent trip to the Padilla home was a result of Padilla, Sr.'s response to the request for the return of the drugs or for payment. *Id.* at 157–58.

Rosemary Santiago ("Rosemary") also testified for the prosecution. Padilla, Sr.'s former paramour, Rosemary was appellant's live-in girlfriend at the time of the murders. Rosemary testified that the day after the Padilla murders, appellant had given her cash and together they purchased a car which was placed in the false name of "Marisol Santiago." Rosemary further testified that when her relationship with appellant began to sour in February 1991, appellant said to her, "I'll kill you like I killed your friends," and that he "should have did [her] like he did [Padilla, Sr.]." N.T. 11/18/92 at 318–20, 328, 394–96, 399.

Philadelphia police officer Julio Aponte testified that on March 22, 1991, he was approached by appellant while Aponte was off-duty. Appellant wanted to know why the Homicide Unit was looking for him, indicating that he thought it had something to do with "those bodies on Third right below the Boulevard" (the location of the Padilla home). Later that same day, appellant again found Aponte and told him that he had been in the house with two other men to "stick this guy up," but one of the other men went crazy and shot the father in the head and stuck a knife through the son's neck. *Id.* at 536. Appellant also told Aponte that he would "take out" any police officer, other than Aponte, who approached him. N.T. 11/20/92 at 528, 529, 536.

An answering machine microcassette was also introduced at trial. Irma Santiago, the daughter of Padilla, Sr., identified a message on the tape as one she had left for her father the day before he was killed. The last message on the tape said, "They're dead. Why did you pick up the phone for? Yo, for

four dollars, this s***, man." Rosemary Santiago identified the voice making that statement as appellant's.

A capital jury convicted appellant of two counts of first-degree murder, two counts of robbery, criminal conspiracy, and possession of an instrument of crime. Following a penalty hearing, the jury found five aggravating circumstances and no mitigating circumstances with regard to the murder of Padilla, Sr.[1] The jury also found five aggravating circumstances and no mitigating circumstances for the murder of Padilla, Jr.[2] Trial Ct. Opinion at 3. Because the jury found no mitigating circumstances, it returned a sentence of death for each murder, as mandated by law. *See* 42 Pa.C.S.

---

1. The aggravating circumstances as to the murder of Padilla, Sr. were: (1) appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); (2) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (appellant had been convicted in a separate trial of second degree murder in the December 30, 1991 death of Ivellison Gonzalez and sentenced to life imprisonment), 42 Pa.C.S. § 9711(d)(10); (3) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (appellant had also been convicted of the second degree murder of Luis A. Bermudez on December 30, 1990, for which he received a life sentence), 42 Pa.C.S. § 9711(d)(10); (4) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (Padilla, Jr.), 42 Pa.C.S. § 9711(d)(10); and (5) appellant paid or was paid by another person or had contracted to be paid by another person or had conspired to pay or be paid by another person for the killing of the victim, 42 Pa.C.S. § 9711(d)(2).

2. The aggravating circumstances as to the murder of Padilla, Jr. were: (1) appellant committed a killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); (2) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (Ivellison Gonzalez), 42 Pa.C.S. § 9711(d)(10); (3) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (Luis A. Bermudez), 42 Pa.C.S. § 9711(d)(10); (4) appellant had been convicted of another Federal or State offense, committed either before or at the time of the offense at issue, for which a sentence of life imprisonment or death was possible (Padilla, Sr.), 42 Pa.C.S. § 9711(d)(10); and (5) the offense was committed by means of torture, 42 Pa.C.S. § 9711(d)(8).

§ 9711(c)(iv). The trial court later sentenced appellant to terms of imprisonment of 10 to 20 years for each of his two robbery convictions, 5 to 10 years for the criminal conspiracy conviction, and 2½ to 5 years for possessing an instrument of crime, all to run consecutively to the death penalty imposed on his first conviction for first-degree murder.

Appellant was represented by his trial counsel, David Rudenstein, Esquire, through the filing of his direct appeal on December 11, 1995. Prior to his November 13, 1995 sentencing, appellant twice requested, *pro se*, that his trial counsel be permitted to withdraw and new counsel be appointed. His first motion was filed on December 6, 1994, and the second was filed on March 29, 1995. Lee Mandell, Esquire, was appointed to represent appellant on January 3, 1996, shortly after the filing of his direct appeal to this Court. After initial briefing, the parties filed a joint request for a remand to the trial court to review factual issues related to possible *Brady*[3] violations and other after-discovered evidence. This Court granted the request in a November 14, 1997 Order entered at Docket No. 130 CAP. Subsequent to the remand, appellant's current counsel, Mitchell Scott Strutin, Esquire, was appointed, and the appeal was briefed anew.

Documents discovered after the original trial revealed that prior to and at the time of trial, Officer Aponte had been involved in criminal activities and was the subject of an investigation by the Ethics Accountability Division of the Philadelphia Police Department. Subsequent to appellant's trial, Officer Aponte was tried and convicted of, among other things, burglarizing drug houses. At a hearing regarding the after-discovered evidence, the court[4] found that, at the time of

---

**3.** *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). "A *Brady* violation has occurred when: (1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." *Commonwealth v. Carson,* 590 Pa. 501, 913 A.2d 220, 244 (2006) (citing *Commonwealth v. Collins,* 585 Pa. 45, 888 A.2d 564, 577–78 (2005); *Commonwealth v. Paddy,* 569 Pa. 47, 800 A.2d 294, 305 (2002)).

**4.** The trial judge was deceased, and thus a new judge heard these issues.

appellant's trial, the Ethics Accountability Division had merely begun the investigation, and neither the District Attorney's office nor Officer Aponte was aware of it. Because of that lack of knowledge, the lower court found no *Brady* violation. The court also indicated that an open investigation cannot be used as impeachment evidence, and therefore, the simple fact of an investigation would not have been material for *Brady* purposes.

The other after-discovered evidence claim involved the other participants in the murders. In a written affidavit, Hector Alicea stated that he was present at both the Gonzalez/Bermudez murders and the Padilla murders. Alicea indicated that appellant killed Gonzalez, Bermudez, and Padilla, Sr. and was present for the killing of Padilla, Jr. Alicea also stated that George Swisher was involved in both incidents. Swisher was also an informant in the Aponte burglary investigations.

Jamod Rohn also came forward and admitted to involvement in both the Gonzalez/Bermudez murders and the Padilla murders. Rohn confirmed that appellant killed Gonzalez, Bermudez and Padilla, Sr. and was present when Padilla, Jr. was killed. Rohn also claimed that Rosemary Santiago participated in the planning of the Padilla robbery and was present at the house during the murders.[56]

On appeal, appellant raises seven issues.

## I. Sufficiency of the Evidence

Although appellant has not challenged the sufficiency of the evidence to support the murder verdicts, in all death penalty direct appeals, this Court reviews the evidence to ensure that it is sufficient to support the first-degree murder conviction, irrespective of whether the appellant specifically raises the issue. *See Commonwealth v. Malloy*, 579 Pa. 425, 856 A.2d 767, 773 (2004); *Commonwealth v. May*, 584 Pa. 640,

5. The defense theory of the case was that Rosemary Santiago committed the murders of the Padillas, a theory that apparently was rejected by the jury. N.T. 11/25/92, 761–81.

6. The trial court found these subsequent claims to be meritless and denied any relief.

887 A.2d 750, 753 (2005). Evidence presented at trial is sufficient when, viewed in the light most favorable to the Commonwealth as verdict winner, the evidence and all reasonable inferences derived therefrom are sufficient to enable the jury to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Watkins,* 577 Pa. 194, 843 A.2d 1203, 1211 (2003); *Commonwealth v. Bridges,* 563 Pa. 1, 757 A.2d 859, 864 (2000). To sustain a conviction for first-degree murder, the Commonwealth must prove, beyond a reasonable doubt, that a human being was unlawfully killed, that the accused was responsible for the killing, and that the accused acted with a specific intent to kill. 18 Pa.C.S. § 2502(a), (d); *Commonwealth v. Spotz,* 563 Pa. 269, 759 A.2d 1280, 1283 (2000), *cert. denied,* 534 U.S. 1104, 122 S.Ct. 902, 151 L.Ed.2d 871 (2002); *Commonwealth v. Wilson,* 543 Pa. 429, 672 A.2d 293, 297 (1996). A defendant may be convicted of first-degree murder on a theory of accomplice liability so long as the facts support the conclusion that the defendant aided, agreed to aid, or attempted to aid the principal in planning or committing the offense, and acted with the intent to promote or commit the offense, *i.e.,* the intentional killing. 18 Pa.C.S. § 306. *See Commonwealth v. Romero,* 555 Pa. 4, 722 A.2d 1014, 1020 (1999); *Commonwealth v. Thompson,* 543 Pa. 634, 674 A.2d 217, 222–23 (1996). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). The Commonwealth may prove that a killing was intentional solely through circumstantial evidence. Moreover, a specific intent to kill may be inferred from the use of a deadly weapon to inflict injury on a vital part of the body. *Commonwealth v. McCullum,* 529 Pa. 117, 602 A.2d 313, 322–23 (1992). A deadly weapon is defined as "[a]ny firearm, whether loaded or unloaded, or any device designed as a weapon and capable of producing death or serious bodily injury, or any other device or instrumentality which, in the manner in which it is used or is intended to be used, is calculated or likely to produce death or serious bodily injury." 18 Pa.C.S. § 2301.

The evidence adduced by the Commonwealth at trial, taken in the light most favorable to the Commonwealth as verdict winner, was ample to support the murder verdicts. Both victims plainly were killed unlawfully. Roberto Gonzalez testified that appellant admitted that he had been involved in the crimes, *i.e.*, that he "did the murders." Rosemary Santiago testified that appellant admitted that he had killed Padilla, Sr., and he threatened that he would kill her, too, just like he had killed "her friends," the Padillas. Officer Aponte also testified that appellant had admitted that he was present for the murder of the Padillas, murders which occurred during a robbery he and his cohorts were executing.

The evidence indicated that appellant shot Padilla Sr. in the head, and thus clearly used a deadly weapon on a vital part of Padilla Sr.'s body, reflecting his specific intent to kill. The torn photograph of Rosemary Santiago suggested motive, malice and a specific intent to kill as well. The nature of the injuries inflicted upon Padilla, Jr.—including an ice pick forced through his temple and a knife pushed from the back of his neck through to the front—likewise reflect an intentional killing. With respect to Padilla, Jr., appellant was also convicted of conspiracy and the jury was charged on accomplice liability. The sum of the evidence—the multiple injuries involving deadly weapons, the prolonged nature of the attack upon Padilla, Jr., and appellant's admissions to Rosemary Santiago and to Roberto Gonzalez—supports the jury's finding that appellant shared in the specific intent to kill, even if he did not himself necessarily deliver one of the killing blows. Accordingly, the evidence, viewed in the light most favorable to the Commonwealth, was sufficient for a jury to find all of the elements of first degree murder beyond a reasonable doubt as to both killings.

## II. Answering Machine Microcassette Tape

█ Appellant alleges that the trial court erred in ordering him to turn over an answering machine tape to the Commonwealth. During appellant's trial for the murders of Ivellison Gonzalez and Luis A. Bermudez, appellant instructed his

mother and sister to bring to court the answering machine tape from the Padillas' answering machine.[7] Appellant's mother gave the tape to his defense counsel in open court, and counsel revealed to the court that the tape had been taken from the Padillas' answering machine.[8] It appears from the trial court opinion that, at some point subsequent to the Gonzalez/Bermudez trial but just before the start of appellant's November 1992 trial in this case, appellant voluntarily allowed the Commonwealth to listen to the microcassette. Then, in November of 1992, the trial court in this matter, upon oral motion of the Commonwealth, ordered appellant to turn over the tape to the Commonwealth.[9] Appellant alleges that, at the time of the Commonwealth's November 1992 oral motion for the turnover of the tape, neither the Commonwealth nor the defense attached any significance to the tape.

The trial record reveals no objection to the introduction of the audio tape or the transcripts of that tape prepared by the Commonwealth following sound enhancement. In appellant's post-trial motion, however, he claimed that, in November of 1992, he objected when the court granted the Commonwealth's oral motion and ordered him to turn the microcassette over to the Commonwealth. Appellant further contended that he timely objected to the order. There is nothing in the record to confirm the existence of such an order or a timely objection by appellant. But the Commonwealth does not dispute that such a ruling and objection in fact occurred, nor does it argue waiver. Moreover, the trial court addressed the claim on the

7. It is not clear from the record whether appellant's family came into possession of the tape lawfully, or had any right to it.

8. The record contains some corroboration that the microcassette tape was given to appellant's attorney in open court during the Gonzalez/Bermudez murder trial, N.T. 11/19/92 at 464–65, albeit the relevant transcript from the Gonzalez/Bermudez trial is not itself part of the record before this Court in this appeal.

9. The trial court's suggestion that appellant gave the tape to the Commonwealth for sound enhancement prior to the court's November 1992 order is buttressed by the testimony of Detective Sergeant Charles Aker that he had earlier prepared a duplicate of the microcassette on October 30, 1992. N.T. 11/19/92 at 432.

merits in its opinion. Under the circumstances, we will deem the claim to be preserved.

In his post-trial motion, appellant argued that the tape was the private property of the Padilla family that had been in the possession of appellant's sister until she gave it to defense counsel in June of 1992 for safekeeping. Appellant further alleged that neither he nor the Commonwealth knew that the tape had any significance until after the court ordered it turned over to the Commonwealth and the Commonwealth had it amplified. At that point, the Commonwealth learned that the tape contained a recording of a voice identified as appellant's stating, "They're dead." According to appellant, prior to the amplification, the Commonwealth had no reason to suspect that the tape had any evidentiary value.

Appellant further argued that the tape was not subject to mandatory discovery under Pa.R.Crim.P. 305 (notice of alibi, insanity or mental infirmity defenses and disclosure of reciprocal witnesses) or to further discretionary discovery under Rule 573. Appellant also claimed that the order directing him to turn the tape over violated his privilege against self-incrimination and amounted to a warrantless seizure. Finally, appellant claimed that, because the Commonwealth failed to establish why the tape might have evidentiary value at the point it requested disclosure, the court improperly permitted it to embark on a "fishing expedition."

In its opinion, the trial court addressed only appellant's arguments that the Commonwealth was on a "fishing expedition" and that the court's order violated procedural rules regarding discovery. The court rejected both arguments, finding that the court had granted the Commonwealth nothing that appellant had not already voluntarily disclosed because the Commonwealth's amplification of the tape occurred before the court ordered the tape turned over to the Commonwealth for purposes of this prosecution:

Indeed, the defense had already voluntarily disclosed the existence, content and possible importance of this demonstrative evidence at this defendant's prior trial for the Ber-

mudez–Gonzalez murders. In addition, physical possession of this evidence had already been granted to the prosecution for the purpose of conducting sound-enhancement testing to sharpen otherwise inaudible portions thereof. Consequently, this Court's order constituted a reaffirmance of rights already voluntarily granted by the defense to the prosecution in terms of discovery. *See,* Pa.R.Crim.P 305A ("a good faith effort to resolve all questions of discovery" and "[n]othing in this provision shall delay the disclosure of any items agreed upon by the parties . . ."). Since these provisions are designed to further the expeditious determination of the truthful facts in a criminal case, it cannot now be complained that this voluntary disclosure was prejudicial to the party granting it.

Tr. Ct. Op. at 51–52.

Appellant argues to this Court that the trial court could properly compel him to turn over the tape only if the tape fell within the discretionary discovery permitted by Pa. R.Crim. P. 573(C). Thus, in appellant's view, to secure the tape, the Commonwealth was required to file a written motion for pretrial discovery which demonstrated materiality and reasonableness. In accordance with Rule 573(C), such discovery is limited to an express list of topics and things,[10] and all such

10. Rule 573(C)(1) lists the permissible discovery:

(1) In all court cases, if the Commonwealth files a motion for pretrial discovery, upon a showing of materiality to the preparation of the Commonwealth's case and that the request is reasonable, the court may order the defendant, subject to the defendant's rights against compulsory self-incrimination, to allow the attorney for the Commonwealth to inspect and copy or photograph any of the following requested items:

(a) results or reports of physical or mental examinations, and of scientific tests or experiments made in connection with the particular case, or copies thereof, within the possession or control of the defendant, that the defendant intends to introduce as evidence in chief, or were prepared by a witness whom the defendant intends to call at the trial, when results or reports relate to the testimony of that witness, provided the defendant has requested and received discovery under paragraph (B)(1)(e) [the Commonwealth's mandatory disclosure of scientific test results or reports, expert opinions, and results of physical or mental examinations of the defendant]; and

discovery is subject to the defendant's right against compulsory self-incrimination. Appellant contends that the Commonwealth was not entitled to the tape in this case because (1) its request was made upon an oral (not written) motion made during (not prior to) trial; and (2) the Commonwealth failed to demonstrate materiality, as the testimonial purpose for which the tape was eventually introduced was impossible to appreciate until the recording had been amplified. Thus, neither side knew the content of the message at the time of disclosure.

The Commonwealth counters that questions regarding discovery in criminal cases are within the trial court's discretion. *Commonwealth v. Rucci*, 543 Pa. 261, 670 A.2d 1129, 1140 (1996), *cert. denied*, 520 U.S. 1121, 117 S.Ct. 1257, 137 L.Ed.2d 337 (1997). The Commonwealth also notes that appellant had already disclosed the existence of this tape at his prior trial for the double murders of Gonzalez and Bermudez, and indeed, police had already made a copy of the tape. For purposes of this case, the trial court ordered appellant's counsel to again turn the tape over to the Commonwealth for examination, upon learning that the tape had been taken from the victims' answering machine. The Commonwealth then introduced the cassette tape into evidence and played for the jury the twenty-six messages on the tape preceding the pertinent message, message number twenty-seven, which contained the words spoken by a man: "They're dead. Why did you pick up the phone for? Yo, for four dollars, this s*** man." N.T. 11/19/92 at 456. Subsequently, appellant, who did not testify on his own behalf, provided a voice sample to the jury for comparison with the voice on the answering machine tape. N.T. 11/23/92 at 709.

Appellant's objection premised upon the discovery rules fails because he was not ordered to disclose the answering machine tape as part of discretionary discovery. More importantly, the proverbial cat was already out of the bag. In the

(b) the names and addresses of eyewitnesses whom the defendant intends to call in its [sic] case-in-chief, provided that the defendant has previously requested and received discovery under paragraph (B)(2)(a)(i) [the names and addresses of eye-witnesses].

course of the prior murder trial, appellant's counsel voluntarily disclosed that appellant's family somehow had secured the answering tape from the victims' home, *i.e.*, the scene of the crime. Appellant's counsel had previously permitted the Commonwealth to listen to the tape, from which it could be determined that the tape indeed was from the Padilla home (the twenty-six messages preceding the pertinent recording were identifiable as messages left for the Padillas). Appellant's argument that the Commonwealth had no viable reason to request the tape in this case likewise is meritless. As evidence from the scene of the murders that somehow was in the possession of appellant's family, there were ample grounds to believe it was material. The question ultimately boils down to whether appellant had some affirmative right to resist disclosure. In this instance, there was not.

The function of a trial is to determine the truth and, absent some affirmative right or privilege, every person's evidence is fair game. In *United States v. Nixon*, 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), the United States Supreme Court cogently set forth the role of discovery in eliciting the facts:

> We have elected to employ an adversary system of criminal justice in which the parties contest all issues before a court of law. The need to develop all relevant facts in the adversary system is both fundamental and comprehensive. The ends of criminal justice would be defeated if judgments were to be founded on a partial or speculative presentation of the facts. The very integrity of the judicial system and public confidence in the system depend on full disclosure of all the facts, within the framework of the rules of evidence. To ensure that justice is done, it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense.

While this Court has never ruled on the precise issue presented whether a criminal defendant must turn over to the Commonwealth physical evidence from the crime scene in his lawyers possession, the general principle set forth in *Nixon*

provides ample guidance. In the quest to develop the relevant facts in a criminal investigation, police officers may execute search warrants of a criminal defendants residence to search for items taken from the crime scene that would indicate that the defendant was present at the scene. Assuming the search was lawfully authorized and conducted, such relevant evidence is clearly admissible against the defendant. Logic dictates that if such evidence is discovered to be in the possession of the defendant, and the Commonwealth requests that the evidence be turned over, the trial court acts within its authority to order such disclosure so that the Commonwealth may reasonably develop the facts of the case. In analogous situations, this Court has reached that precise result.

In *Lepley v. Lycoming County Court of Common Pleas*, 481 Pa. 565, 393 A.2d 306 (1978), this Court found that the trial court properly ordered defense counsel to produce to the Commonwealth a copy of a tape counsel had made of the preliminary hearing testimony of a witness who was unavailable to testify at trial. Subsequent to the preliminary hearing, the witness, who was the defendants co-conspirator, indicated that if called to testify at trial, he would invoke his Fifth Amendment right against self-incrimination. Lycoming County did not, at that time, routinely transcribe preliminary hearings. The Commonwealth petitioned the trial court to order defense counsel to turn the tape over because it was the sole record, aside from the recollections of spectators, of the witness's testimony. The trial court granted the petition, finding that, the tape recording is in the nature of real evidence relevant to the issue of innocence or guilt and [ ] the Commonwealth has a right of access to the same for possible use at trial. *Id.* at 308. Rejecting arguments that the tape was privileged as attorney work product and that its disclosure violated the defendants Fifth Amendment rights, this Court upheld the trial courts decision, finding that the order was in accord with the general principle enunciated in *Nixon* that the parties should be permitted to develop the facts to ensure that justice is done.

Similarly, in *Commonwealth v. Brinkley*, 505 Pa. 442, 480 A.2d 980 (1984), this Court affirmed a trial court order requiring defense counsel to disclose witness statements to the Commonwealth. At trial, during cross-examination of defense witnesses, the prosecutor learned that several of the witnesses had given statements to defense counsel, and the prosecutor requested that defense counsel produce the statements. Counsel objected, arguing that the statements constituted work product. The trial court overruled the objections and issued a narrowly tailored disclosure order, which applied only to the actual statements. This Court held that the trial courts narrow order was appropriate, noting that, in the interest of ensuring justice, the Commonwealth could have been required to produce such statements to the defense.

In the case *sub judice*, appellant voluntarily disclosed the existence of the tape in open court in a prior trial and permitted the prosecution to listen to the tape. This tape was evidence from the crime scene that somehow had come into appellants possession. In addition, far from being privileged to withhold the tape taken from the victims home, there is no evidence demonstrating that appellant had any right to the tape at all. In keeping with *Nixon* and this Courts decisions in *Lepley* and *Brinkley*, the trial court did not err in requiring appellant to provide the Commonwealth with evidence taken from the crime scene.

Finally, appellant's argument that the trial court's order violated his Fifth Amendment right against self-incrimination is unavailing. The Fifth Amendment privilege against self-incrimination does not apply to physical evidence. *See Pennsylvania v. Muniz*, 496 U.S. 582, 588–89, 110 S.Ct. 2638, 110 L.Ed.2d 528 (1990) ("we have long held that the privilege [against self-incrimination] does not protect a suspect from being compelled by the state to produce real or physical evidence."); *Schmerber v. California*, 384 U.S. 757, 764, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966) Appellant had no right to retain this physical evidence taken from the crime scene, nor was it privileged. Furthermore, the statement appellant left on the answering machine tape was not a product of govern-

mental coercion. Accordingly, the trial court did not abuse its discretion.

### III. Cross–Examination of Detective Danks

■ Appellant next alleges that the trial judge erred in limiting the defense cross-examination of Detective William Danks. In an attempt to discredit the police statement of Roberto Gonzalez, defense counsel sought to elicit testimony indicating that the detective could have tape recorded the statement, but did not. Detective Danks testified that he quickly discovered that Gonzalez had difficulty hearing and that he was mentally "slow." N.T. 11/17/92 at 232. On direct examination, the detective described the manner in which he took Gonzalez's statement:

Q. You took the statement, C–51A, that's in front of you, correct?

A. Yes.

Q. And that was a handwritten statement as opposed to a typewritten statement?

A. Yes.

Q. What was the process that you utilized; what did you do?

A. It's as close to verbatim as I could get it. By the way, this is in my hand; I wrote this. I would formulate a question, write it out and ask him the question and then I would record his answer as best I could as he was giving it. Then, after his answer, I would formulate my second question, write it out and then ask him the question.

N.T. 11/17/92 at 230–31.

The statement from Gonzalez that Detective Danks read to the jury suggested that Gonzalez's responses to the detective's questions were clear and logical, containing references to specific months in which certain events occurred. Appellant argued below, and alleges now, that Gonzalez's more scattered testimony at trial suggested that Detective Danks must have filled in holes in Gonzalez's memory by providing him with the time frame of the events covered in the statement. On cross-

examination, appellant's counsel sought to elicit from Gonzalez that Detective Danks had provided him with some of the information contained in the statement:

Q. Do you remember-you don't remember the day, but you remembered the date when you talked to the police; correct?

A. Yes.

Q. Isn't that because the police were helping you fill in the blanks?

A. Well, as they read it over to me, some of it would just come to my mind, you know.

Q. So, in other words, as the police were reading what your answers should be, it came to your mind, and you said, "Yes, I saw him back in December?"

A. Yes. I also corrected two simple words that came into the statement.

Q. So, the police going over this case helped you remember?

A. Yes.

Q. What I am saying, the police, when they were speaking to you on April 30th, they were helping you remember on that day; correct?

A. Yes.

\* \* \* \*

Q. So, when you gave the date of January to the police or when they wrote January down, that was not the truth, that was not your word, it was the policemen's word; right?

[Objection by prosecutor overruled]

Q. Am I correct in stating that it was the detective's word, January, and not your own word, correct?

A. Yes.

N.T. 11/17/92 at 190–95. Based upon this exchange and other similar exchanges, appellant argues that Gonzalez's relatively cogent police statement must have been the result of assistance from Detective Danks. Therefore, appellant maintains, his counsel should have been permitted to cross-examine

Detective Danks about the availability of recording equipment at the time he took Gonzalez's statement. According to appellant, such a recording would have demonstrated to the jury that Detective Danks supplied some of the information in Gonzalez's statement. When defense counsel attempted to question Detective Danks about the possibility of recording Gonzalez's statement, the trial court sustained the Commonwealth's objection. N.T. 11/17/92 at 266–67. Appellant claims this ruling was erroneous.

Cross-examination in criminal cases may extend beyond the subjects of direct testimony and "includes the right to examine a witness on any facts tending to refute inferences or deductions arising from matters testified to on direct examination." *Commonwealth v. Green*, 525 Pa. 424, 581 A.2d 544, 558 (1990) (citing *Commonwealth v. Lopinson*, 427 Pa. 284, 234 A.2d 552 (1967), *vacated on other grounds*, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968)). However, the scope of cross-examination is within the sound discretion of the trial judge and, absent an abuse of that discretion, an appellate court will not disturb the trial judge's rulings. *Commonwealth v. Auker*, 545 Pa. 521, 681 A.2d 1305, 1317 (1996).

We conclude that the trial court's ruling provides no basis for relief. Appellant argues that Gonzalez admitted that the police provided him with the answers to some of their questions, and therefore, a recording of the original interview would be relevant to show police manipulation. But the fact that a recording would be relevant or helpful does not mean that police were obliged to make the recording. Of course, although police in this Commonwealth are not required to record statements with witnesses or suspects, neither are they precluded from taking such measures in order to provide an objective record of the interview. Such a recording could conclusively confirm or refute a claim of police manipulation. Thus, there is force in appellant's argument that, where there is some basis in fact for the defense to argue police manipulation of a statement which was not recorded, questioning about the availability of a tape recorder should be permitted.

Here, there was some basis for the argument of police manipulation, and the better course would have been to permit the line of inquiry.

Nevertheless, we conclude that any error in this regard was harmless. Notwithstanding the court's ruling, the defense was able to make its point, and quite forcefully so, concerning possible police manipulation of Gonzalez's statement. The jury observed Gonzalez on the witness stand, and was able to assess for itself his limitations and difficulties. The defense did not need to question the detective to be able to argue that the jury need only compare what they saw on the stand to the contents of the police statement to realize that Gonzalez's statement reflected manipulation by police. Indeed, the defense argued police fabrication at length in closing:

> Let's talk about Robert Gonzalez. Robert had memory problems; he had hearing problems; he had psychiatric problems.

* * * *

> Now, he says that one day during the two-week stay, [appellant] comes into the kitchen and, more or less, out of the blue, he starts talking about what happened. Then, Robert says that [appellant] said, well, we broke the front door. Well, you know that's not true because the front door was not broken. If [appellant] was there and the front door wasn't broken, he wouldn't have told Robert the front door was broken. I am suggesting to you, and I'll suggest more later, that the police gave Robert Gonzalez a statement and when the police gave Robert a statement, they had to give it to him in such a way as to be credible in court. So, what they do, they throw in a mistake or two to make it sound like, well, Robert was trying to be honest, but he didn't know everything and he got confused. Robert wasn't confused and the police officer who gave Robert the statement wasn't confused, but he gave it to him to make it seem to you that Robert was being truthful.

* * * *

What else did he say? He said he remembers in early January, that [appellant] bought some cars, and with regard to the meeting with the Mercedes, my recollection is that Robert said that occurred in December. Whether these things happened in December or January, they happened four or five months prior to the time that Robert gave a statement, so he does remember the time and the place and what happened and he even remembers some of the things that the man in the Mercedes said. Did he remember from the witness box? Do you remember what yesterday morning was? You heard the man testify; you saw the man testify. You saw the manner, way and mode in which he testified and you're going to believe that when he spoke to the police he remembered incidents as to the times and places and dates and what was said five months earlier. Again, reasonable doubt.

In the statement that you heard that Detective Danks read, 14 pages of statement that took over four hours. What didn't we see in there. We didn't see one, ["]I don't remember,["] for an answer. Isn't that strange, the young man who had so much trouble remembering talked to the police for four hours and didn't have any trouble remembering.

\* \* \* \*

Now, if Robert didn't give the statement, where did the statement come from? It came from the police.

\* \* \* \*

Detective Danks is called as a witness and he read the statement. It was interesting because he said, yeah, at first, I was having trouble getting his address. Well, the man had psychiatric problems and he couldn't remember. Then the detective said, it was my fault. So, what did the detective do? In an almost downright neighborly way, he pulled up his chair and sat down at the table and spoke a little louder. Now, you're in a locked room, a closed room down at the P.A.B. The boy can't remember his address and now, the detective is speaking a little louder. If you remember what Gonzalez said, he said, oh yeah, the detec-

tive, he kept repeating the answers and filling in the blanks. I think it is crystal clear where the statement of Gonzalez comes from.

N.T. 11/25/92 at 782–88.

Although the trial court did not permit counsel to question Detective Danks concerning the availability of recording devices, the court did not limit counsel's examination of Gonzalez, or his argument on the salient overriding point: that Gonzalez's police statement should be deemed unreliable, because the distinction between his apparently clear memory at the time he gave his statement and his performance on the witness stand at trial suggested police manipulation of the statement. The excluded inquiry would have supported the point in some respects, but its exclusion was not harmful. Thus, this claim does not entitle appellant to relief.

## IV. Ineffective Assistance of Counsel

■■■ Appellant next claims that his trial counsel was ineffective in failing to request that the trial court instruct the jury that the Commonwealth was required to prove that appellant acted with a specific intent to kill in order to convict him of first-degree murder. In *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002), *reargument denied*, 573 Pa. 141, 821 A.2d 1246 (2003), this Court abrogated the rule requiring new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity after new counsel is appointed, and held that claims of ineffective assistance of counsel generally should be deferred until collateral review. 813 A.2d at 728 (overruling *Commonwealth v. Hubbard*, 472 Pa. 259, 372 A.2d 687 (1977)). *Grant* expressly applies to all cases, including the instant case, that were on direct appeal at the time the decision was rendered. *Id.* at 738.

In *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), this Court recognized a limited exception to *Grant's* deferral rule. *Bomar* was litigated in the PCRA court under the *Hubbard* rule and unitary review. Bomar's trial counsel withdrew from the case after sentencing, and new counsel entered the matter and filed post-sentence motions, raising

claims of ineffective assistance of counsel. The trial court conducted hearings at which counsel testified, and later wrote an opinion addressing the merits of the claims. In such a circumstance, we determined, the concerns which powered the rule in Grant were not implicated. Therefore, the *Bomar* Court held, this Court would also pass upon the merits of the claims on direct review. *Id.* at 853–55; *see also Commonwealth v. May*, 584 Pa. 640, 887 A.2d 750, 758 (2005) (discussing *Bomar*).

Appellant appears to believe that the fact that his claim of counsel ineffectiveness is record-based alone is sufficient to allow us to address the claim under the *Bomar* exception. But there was no hearing on the ineffective assistance claim below, meaning that counsel did not testify, and thus there is an insufficient factual record to consider the claim. Moreover, as this Court noted in *May, supra:*

> [T]here is no reason to believe that the record-based challenges here exhaust the universe of claims respecting trial counsel's performance, both record-based and non-record-based, which might be pursued in the fuller procedural time-frame made available for PCRA review. Entertaining these claims now would likely involve piecemeal review and would generate the future complication of requiring appellant to "layer" additional claims of ineffectiveness upon PCRA review. Accordingly, to facilitate a more appropriate and complete review of appellant's collateral claims, we dismiss the instant claims of ineffective assistance of trial counsel without prejudice to appellant's right to pursue those claims in a petition filed pursuant to the PCRA.

887 A.2d at 758. Accordingly, this claim is dismissed without prejudice.[11]

---

11. In *Commonwealth v. Rega*, 593 Pa. 659, 933 A.2d 997 (2007), three Justices recently expressed the view that this Court should reexamine the circumstances under which criminal defendants should be permitted, if ever, to raise collateral claims in the post-verdict and direct review context. *Id.* at 1029 (Cappy, C.J., concurring); *id.* at 1029–33 (Castille, J., joined by Saylor, J., concurring). In this case, however, it is clear that the claim of ineffective assistance cannot be reached.

## V. Submission of Torture Aggravator to Jury

Appellant next contends that the Commonwealth failed to prove beyond a reasonable doubt that Padilla, Jr. was tortured, which was one of five aggravating circumstances found by the jury.

> To establish a murder was committed by means of torture, the Commonwealth must prove the defendant "intentionally inflicted on [the victim] a considerable amount of pain and suffering that was unnecessarily heinous, atrocious, or cruel, manifesting exceptional depravity." *Commonwealth v. Karenbauer*, 552 Pa. 420, 715 A.2d 1086, 1099 (1998); *Commonwealth v. Edmiston*, 535 Pa. 210, 634 A.2d 1078, 1091 (1993); *Commonwealth v. Thomas*, 522 Pa. 256, 561 A.2d 699, 709 (1989). "The linchpin of the torture analysis is the requirement of an intent to cause pain and suffering in addition to the intent to kill." *Commonwealth v. Ockenhouse*, 562 Pa. 481, 756 A.2d 1130, 1136 (2000). That is to say, there must be an indication that the defendant was not satisfied with the killing alone. *Commonwealth v. King*, 554 Pa. 331, 721 A.2d 763, 780 (1998).

*Commonwealth v. Cuevas*, 574 Pa. 409, 832 A.2d 388, 395 (2003). This Court has determined that the factors to be considered in determining whether a murder was accomplished through torture include, but are not limited to: (1) the manner in which the murder was accomplished, including the number and type of wounds inflicted; (2) whether the wounds were inflicted on a vital or non-vital area of the body; (3) whether the victim was conscious when the wounds were received; and (4) the duration of the episode. *Ockenhouse*, 756 A.2d at 1137.

Three of Padilla, Jr.'s injuries were potentially fatal on their own: (1) the strangulation; (2) the knife wound to the neck; and (3) the ice pick through the temple. Padilla, Jr. was also beaten. The medical examiner testified at trial that he was unable to determine the order of the injuries, that any one of the injuries alone could have been sufficient to cause death, and that he was unable to ascertain whether the victim was

conscious when the individual injuries were sustained. N.T. 11/19/92 at 488, 490, 495–97.

■■■ The Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. *See, e.g., Commonwealth v. Baker,* 531 Pa. 541, 614 A.2d 663 (1992); *Commonwealth v. Lambert,* 529 Pa. 320, 603 A.2d 568 (1992). The very array of injuries inflicted upon the victim here was sufficient to warrant the jury in finding, beyond a reasonable doubt, that the torture aggravator existed. Padilla Jr. was not merely beaten: he was also knifed, stabbed with an ice pick, and strangled. Moreover, he was bound and there was evidence of his "waddling" across the floor while bound, suggesting he was alive for some time after being so incapacitated. The jury was not obliged to conclude that the first of the potentially fatal injuries must have caused immediate death, and that the other injuries were gratuitous indignities inflicted upon a dead body. Instead, they could draw the logical conclusion that the murderers intended to cause pain and suffering well beyond that inherent in death, which is "the linchpin of the torture analysis." *Ockenhouse, supra.* In any event, because the jury found five aggravating circumstances and no mitigating circumstances respecting the murder of Padilla, Jr., the death sentence would necessarily be affirmed even if we were to conclude that the torture aggravator should not have been submitted to the jury. *See, e.g., Commonwealth v. King,* 554 Pa. 331, 721 A.2d 763, 784–85 (1998).

## VI. Exclusion of Mitigation Evidence

■■■ Appellant argues that because the jury came to a general guilty verdict, without any specific indication of whether he was found guilty as the principal actor in both murders or as an accomplice or co-conspirator in one or both murders, he should have been permitted to argue that, if the jury's guilty verdict was premised on anything other than his actions as a principal, he was entitled to argue his comparative culpability under the catchall mitigating circumstance. 42 Pa.C.S. § 9711(e)(8) ("Any other evidence of mitigation concerning the character and record of the defendant and the

circumstances of his offense."). Appellant alleges that U.S. Supreme Court precedent, including *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (plurality), *Bell v. Ohio,* 438 U.S. 637, 98 S.Ct. 2977, 57 L.Ed.2d 1010 (1978), and *Green v. Georgia,* 442 U.S. 95, 99 S.Ct. 2150, 60 L.Ed.2d 738 (1979), mandate that he be permitted to argue that his level of participation in the crime should be deemed a mitigating circumstance in the jury's penalty consideration.

Appellant identifies the following exchange, which occurred during defense counsel's summation at the sentencing phase of the trial, as the trial court ruling which prohibited him from arguing relative culpability as mitigation:

[Defense Counsel]: ....

Now, again, I don't know what you believed with regard to the offense you found him guilty of but, if you believed that he did not do the killings, but was a conspirator....

[The Prosecutor]:

Objection.

[The Court]:

Sustained. You are not to inquire into criminal responsibility, you have already adjudicated guilt in the case.

[Defense Counsel]: Note my exception, your Honor.

N.T. 12/1/92 at 134–35. Faced with the Commonwealth's objection and the trial court's ruling, appellant made no proffer, nor did he articulate any basis for his argument. Nor did he argue to the court that he would not "inquire into criminal responsibility," which is apparently where the court believed he was heading, but instead was attempting to pursue his current claim of "my-relatively-lesser-involvement-in-one-of-the-murders-is-a-mitigating-circumstance."

The Commonwealth argues that appellant's line of questioning was not excluded on the basis of the content of the argument, but rather because appellant failed to put on any evidence to support such an argument. Additionally, the Commonwealth notes that the trial court expressly indicated to defense counsel at the outset of the sentencing phase that he could argue appellant's relative participation in the Padilla

murders to the sentencing jury: "Now we're in a second individual set of verdicts. The facts and circumstances as to these offenses can come in under (e)(8)." N.T. 12/1/92 at 14.

Preliminarily, we must examine whether the exchange where counsel noted his exception was sufficient to preserve the claim of error that appellant now pursues on appeal. Based upon this Court's precedent, a person cannot be convicted of first-degree murder under a theory or charge of vicarious liability unless the fact-finder determines that the actor personally harbored a specific intent to kill. When counsel argued as to both murders that the jury **may** have found only that appellant was a mere conspirator, the trial court understandably deemed that to be an improper attempt to relitigate appellant's overall criminal responsibility for first-degree murder. Appellant could have responded with a differently angled and more precise argument, articulating to the trial court the narrow and precise theory of relative culpability he pursues here. Such an argument, however, would have had to concede that the jury had found, at a minimum, that appellant harbored a specific intent to kill both victims, and that he either participated in a criminal conspiracy for that very purpose or he deliberately aided and abetted the person or persons who committed the fatal act. Thus, defense counsel could have argued that, although appellant was indeed fully **responsible** for these multiple first-degree murders, for penalty purposes, the jury could find that his culpability was "relatively" lesser than that of his cohorts. This, however, is not the argument counsel made, and he proposed no other theory or argument. Nor did counsel articulate to the trial court the basis for his objection. Perhaps counsel failed to appreciate the nuance. But, the trial court did not prevent appellant from presenting evidence, or argument, along the narrow permissible line in this area. The current claim of error, therefore, was not preserved. *See* Pa.R.A.P. 302(a).

In this regard, it is notable that the trial judge, the Honorable Robert A. Latrone, an experienced homicide trial jurist, wrote a careful, 67–page opinion in this case. In that opinion, Judge Latrone deemed the claim that he prevented appellant

from pursuing a proper mitigation argument as "an utter falsehood." Judge Latrone noted that he "did **not** forbid defense counsel from presenting evidence regarding the 'facts and circumstances' of the Padilla killings" under the catch-all mitigator. Judge Latrone also recognized that appellant could have argued the circumstances of the killing, and his relatively "minor" "participation in the homicidal act" as mitigation. Trial Ct. Op., 5/17/96, at 58–59 (emphasis by Judge Latrone). But appellant never articulated such an argument and the record exchange bears out this finding.

■■■ In any event, and in the alternative, the supposed error in sustaining the Commonwealth objection was constitutionally harmless. Appellant produced no affirmative evidence at the penalty phase to establish his supposed lesser role in the "killings;" instead, he claims, his counsel was prevented from arguing his role based on the guilt phase evidence. Thus, the alleged error here involves argument, not evidence. In addition, the mitigation argument appellant says was denied him was not compelling. The jury was considering the proper punishment for appellant's **third and fourth** murder convictions; the jury was properly made aware of appellant's prior murder convictions as they provided aggravating circumstances for the instant murders. The real-world impact of the "precluded" argument is this: "I am criminally responsible for not one, but two first-degree murders here. As you have heard, these are my third and fourth murder convictions. But, you should view it as a point of mitigation that, as to one of these two murders, the Commonwealth did not show that I actually committed the homicidal act." It must be remembered that the jury in this case unanimously found five aggravating circumstances as to each murder, circumstances which largely concerned appellant's unique status as a multiple murderer thrice over. On such a record, the notion that the overall penalty verdict in this case would have been different if only counsel had argued that appellant's relative culpability, for one murder, was less than that of his confederates, is simply not credible. Thus, even if it is assumed that

the trial court had erroneously precluded this argument in mitigation, any such error plainly was harmless.

## VII. Alleged *Brady* Violations

▮▮▮▮ Appellant next asserts that the Commonwealth's alleged failure to disclose to defense counsel that an internal investigation of Officer Julio Aponte was initiated prior to appellant's November 1992 trial violated *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). To prove a *Brady* violation, the defendant must show that: "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant, and (3) the suppression prejudiced the defendant." *Commonwealth v. Carson*, 590 Pa. 501, 913 A.2d 220, 245 (2006) (citing *Commonwealth v. Collins*, 585 Pa. 45, 888 A.2d 564, 577–78 (2005)).

The lower court found that there was no evidence that the District Attorney's Office possessed any knowledge that Officer Aponte was under investigation at the time of appellant's trial. Although a member of the Police Department's Ethics Accountability Division, which was conducting the investigation, contacted the Philadelphia District Attorney's office to inquire about procedural matters, the names of the officers under investigation were not disclosed because of the confidential nature of the investigation. Accordingly, the lower court determined that the first prong of the test, *i.e.*, that the prosecutor suppressed evidence, was not met. The lower court also noted that evidence of this sort, *i.e.*, the investigation of a police officer for involvement in uncharged crimes, could not have been used at trial as there was not yet a conviction at that point. Furthermore, the court held that, because Officer Aponte himself did not know about the investigation at the time of the trial, there could be no implication that he testified as he did in exchange for, or in hope of, favorable treatment by the prosecution. Thus, the court reasoned, there was no basis to use this evidence for impeachment purposes, even had the District Attorney's office been aware of the investigation.

Appellant notes that, in a case decided some years after the trial in this matter, the U.S. Supreme Court held that, for

*Brady* disclosure purposes, the prosecutor's obligation extends to materials within the control of the relevant government, and not just materials within the prosecutor's office. *See Commonwealth v. Burke*, 566 Pa. 402, 781 A.2d 1136, 1142 (2001) (applying *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995), and overruling contrary Pennsylvania decisions). It is not clear whether the *Kyles* rule applies to this pre-*Kyles* trial. On the one hand, *Kyles* involved federal habeas corpus review of a state court conviction and the Court applied the rule to that case, which seems to suggest that the rule was commanded by *Brady* itself. On the other hand, the *Kyles* decision was rendered before passage of the federal Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") which, in theory at least, requires federal habeas court deference to reasonable state law decisions. In addition, the fact that the information here was the subject of a confidential investigation in its infancy should distinguish *Kyles* on the facts, even if its rule were deemed applicable to a pre-*Kyles* trial.

For purposes of decision alone, we will assume that *Kyles* applies and that whatever was known to police at the time of trial is chargeable also to the prosecution. The evidence at issue here is not exculpatory evidence under *Brady* given that the investigation had not yielded any information or conclusion that could have been helpful to appellant at the time of his 1992 trial. Accordingly, the lower court did not err in rejecting the *Brady* claim.

## VIII. After-discovered Evidence

 Appellant next claims that he is entitled to relief premised upon his claim of after-discovered evidence. That evidence includes statements by two men, Hector Alicea and Jamod Rohn, who admit to being co-conspirators not only in the two murders in this case, but also in the Bermudez and Gonzalez murders, for which appellant was convicted in a separate trial. Alicea, who is Rosemary Santiago's cousin, participated in the instant trial only to the extent of providing a voice sample and identifying appellant's voice as the voice on

the answering machine microcassette taken from the Padilla home. However, in 1996, some years after appellant's conviction, Alicea made a statement, claiming that: (1) he was present for all four murders; and (2) appellant shot and killed Bermudez, Gonzalez, and Padilla, Sr., and was present for the killing of Padilla, Jr. Although this constitutes greater knowledge of the crimes than Alicea had previously confessed to having, if believed, it was eyewitness information that appellant directly killed three victims and corroborated the evidence of appellant's guilt for the fourth murder.

Rohn likewise admitted, after appellant's trial, to his involvement in all four of the murders and also admitted to raping Ms. Gonzalez prior to appellant killing her. Rohn's story also corroborated Alicea's to the extent that both men indicated that appellant shot Bermudez, Gonzalez and Padilla, Sr., and was at least present for the killing of Padilla, Jr. Rohn also claimed that Rosemary Santiago was involved in the planning of the Padilla robbery and was present in the house during the murders.

To obtain relief based on after-discovered evidence, appellant must demonstrate that the evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted. *Commonwealth v. Randolph,* 582 Pa. 576, 873 A.2d 1277, 1283 (2005); *Commonwealth v. McCracken,* 540 Pa. 541, 659 A.2d 541, 545 (1995). The trial court correctly determined that the evidence of these two confessed fellow conspirators and murderers was unlikely in the extreme to change the result of the trial. Indeed, these witnesses would have corroborated that appellant was guilty of three murders as a principal actor, and corroborated that he was in position to aid and abet in the fourth murder. The evidence, taken as a whole, was both corroborating and inculpatory, not exculpatory. As the test is conjunctive, there is no need for analysis of the remaining prongs of the test.

## IX. Statutory Review of Death Sentences

Because we find no error in appellant's sentences of death for the murders of Pablo Padilla, Sr., and Pablo Padilla, Jr., we must affirm the sentences of death unless we find that they were a product of passion, prejudice or any other arbitrary factor. 42 Pa.C.S. § 9711(h)(3)(i). We have reviewed the trial record and conclude that the sentences of death were not a product of passion, prejudice, or any other arbitrary factor, but were based upon the evidence. The evidence also was sufficient to support the aggravating circumstances the jury found when it imposed both death sentences. *See* 42 Pa.C.S. § 9711(h)(3)(ii).

Accordingly, we affirm the verdicts and the judgments of sentence, including the sentences of death.[12]

Justices SAYLOR and EAKIN, TODD and McCAFFERY join the opinion.

Justice BAER files a concurring opinion.

Justice BAER concurring.

I join the majority opinion in its entirety except with respect to Part VI, where it determined that Appellant's counsel waived his right to argue during his closing to the penalty-phase jury that Appellant's lesser level of participation in the murders was a mitigating factor. Like the majority, I agree that although the guilt-phase jury had determined that Appellant had the specific intent to kill Padilla, Sr., and Padilla, Jr., and was therefore responsible for the murders, his counsel had the right to argue to the penalty-phase jury that, in accord with the "catch-all mitigator," Appellant's "culpability was relatively lesser than that of his cohorts. . . ." Majority Opinion at 290. *See* 42 Pa.C.S. § 9711(e)(8) ("Mitigating circumstances shall include the following: . . . (8) Any other circumstance of mitigation concerning the character and record of the defendant and the circumstances of his offense.")

---

12. The Prothonotary of the Supreme Court is directed to transmit a complete record of this case to the Governor in accordance with 42 Pa.C.S. § 9711(i).

Indeed, the trial court seemingly agreed with this premise. Prior to the penalty-phase summations, it expressly indicated to defense counsel that he could argue that Appellant's reduced level of participation in the murders should be considered as a mitigating circumstance. N.T. 12/1/1992 at 14. However, when Appellant's counsel began to make this argument at closing, perhaps somewhat imprecisely, by noting: "Now, again, I don't know what you believed with regard to the offense you found him guilty of but, if you believed that he did not do the. killings, but was a conspirator ..." (N.T. 12/1/92 at 134–35), the prosecutor immediately objected and the trial court sustained the objection. Rather than breaking off his summation, counsel noted his objection on the record, and continued with his plea for his client's life, without the opportunity to make this peculiar argument.

The majority in substance holds that counsel should have interrupted his closing and engaged in extended argument with opposing counsel and the court, in the hope that he could persuade the judge to reverse his ruling. Regardless of the eventual result, counsel would have lost all emotional momentum, and may, indeed, have irritated the jury during what was, at best, a difficult task. Although with the benefit of a record to read and thoughtful hindsight, I understand the basis for the prosecutor's objection and the trial court's ruling, I believe also that they understood what defense counsel intended to argue. Moreover, counsel lodged an objection to the trial court's ruling. Under these circumstances, I would not find waiver. I do not believe it wise to articulate a rule requiring the interruption of a closing to dispute a trial court's ruling in order to preserve a question for appellate review, especially where, as here, counsel objected to such ruling.

Nevertheless, I agree with the majority that the trial court's preclusion of counsel's argument in this context was harmless for all of the reasons so ably developed by its opinion.