J-A30032-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| I. DEAN FULTON | : | |
| | : | |
| Appellant | : | |
| | : | No. 1729 EDA 2014 |

Appeal from the Judgment of Sentence January 17, 2014
In the Court of Common Pleas of Philadelphia County
Criminal Division No(s): CP-51-CR-0012441-2010

BEFORE: MUNDY, JENKINS, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED April 27, 2016**

Appellant, I. Dean Fulton, appeals from the judgment of sentence entered in the Philadelphia County Court of Common Pleas after a jury found him guilty of third-degree murder[1] and possessing an instrument of crime.[2] He seeks relief based on the denial of his suppression motion, the failure of the Commonwealth to disclose material evidence, the sufficiency of the evidence, the trial court's jury instruction on justification/self-defense, and the trial court's *in limine* ruling to admit evidence he previously carried a firearm if he presented evidence of his good character.  We affirm.

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 2502(c).

[2] 18 Pa.C.S. § 907.

In the early morning hours of June 15, 2010, Michael Toll ("Decedent") called 911 and reported he had been shot at 54th Street and Florence Avenue in the City of Philadelphia. Decedent managed to drive two blocks to 56th Street before his vehicle came to a rest on the sidewalk. Police Officer Steven Mitchell responded to the 911 dispatch and located Decedent inside his vehicle. Decedent was still conscious and told the officer that "Jeff" had reached through the passenger window of his vehicle and shot him.

Decedent was shot three times: once in his right armpit, once in his right abdomen, and once in the lower right abdomen. Decedent was transported to the Hospital of the University of Pennsylvania. He died two days later on June 17, 2010, at 11:46 a.m. An autopsy revealed that Decedent was shot with a 9-millimeter pistol. The shot to Decedent's lower right abdomen was a contact wound. The remaining two shots were fired from between six inches to two-and-one-half feet away. Police officers recovered Decedent's cell phone, a 9-millimeter Cor-Bon shell casing, and a 9-millimeter Winchester shell casing from inside Decedent's vehicle. Decedent's phone revealed that he made six calls to 267-206-7343 shortly before he was shot. The 267-206-7343 number was stored in Decedent's phone under the name "Jeff."

On June 17, 2010, at 11:48 a.m., Philadelphia Police Officers John Krewer and Toren Saunders went to 6032 Lindberg Avenue to investigate a report of a person with a gun. They detained several individuals in or near a

Mercury Marquis vehicle, including Appellant, Randolph Bell,[3] Anthony Byrd, and Eric Adams. When asked for his name and birth date, Appellant stated his name was "Faheem Miller" and gave two different birth dates. Officer Krewer recognized Appellant from a photograph previously shown to him by homicide detectives. Appellant, Bell, and Byrd were taken to the Southwest Detectives Division for a suspected firearms violation. Officer Krewer seized an iPhone from Appellant while Appellant was in the backseat of the officer's vehicle.

While at the scene, officers observed a firearm inside the Mercury Marquis. That same afternoon, at 3:40 p.m., Detective William Farrell prepared an affidavit of probable cause to search the vehicle. Officers executed the warrant at 4:50 p.m. and seized a firearm,[4] a holster, and three cellphones from the vehicle. The individuals and property were transported from the Southwest Detectives Division to the Homicide Unit.

Homicide Detective John Harkins testified he received the phones and they were "opened, powered up and the menu [was] searched for a phone number corresponding to each phone." N.T. Suppression Hr'g, 8/21/13, at 47. The detective discovered one of the phones, a Samsung flip phone, had the number 267-206-7343, the same number stored in Decedent's phone

---

[3] The Mercury Marquis was registered to Randolph Bell, who was referred to at trial as "Randy" or "J.R."

[4] The firearm in the Mercury Marquis was not related to the instant homicide.

under the name "Jeff." The detective retained possession of the phones, but did not prepare property receipts for them.

The following day, June 18, 2010, at 5:30 p.m., Anthony Byrd gave the following transcribed and signed statement to homicide detectives:

> This was yesterday about 11:00—something in the morning. Me and Eric were just hanging out. Basically the boy Randy and his girl was there, too, but they was in her car. We was in a drive behind Mark's house.[5] Eric had already mentioned something to me about Red Fox having shot somebody a day or two earlier but didn't really get into any details about it. While we was hanging out, Red Fox walked up to us and started hanging out.
>
> We was just kicking back. Eric started asking Red Fox what happened the other night. He (Red Fox) said he went to meet some fiend at 54th and Beaumont. He said he was going to serve the guy. Got in the guy's car. He said the guy then wouldn't let him out of the car. He thought the guy was getting ready to rob him. So he shot the guy. . . .

N.T. Trial, 8/26/13, at 219-20. Byrd identified a photograph of Appellant as "Red Fox" and initialed the photograph. *Id.* at 224. Byrd also indicated that he previously saw Appellant in possession of a .32 revolver.

On June 19, 2010, at 7:05 a.m., Eric Adams gave the following written and signed statement to homicide detectives when asked about a recent shooting:

> The young boy Red was telling me and my friend Byrd about it. This was right before the cops grabbed us up in

---

[5] Byrd identified a photograph of Clifford Jordan as "Mark."

- 4 -

the back of Lindbergh outside Mark's houses.[6] . . . He said he met up with this white guy to sell to him and got in the boy's car. He said he got in the passenger's side of the car. He said the guy kept reaching down next to the driver's seat and was making him nervous. He said the boy looked like he was about to pull something out. So he shot him. He said he was then trying to get out of the car but the inside door wouldn't open for him. So he climbed out of the car window.

*Id.* at 238-39. Adams identified a photograph of Appellant as "Red" and stated he stored "Red's" phone number, 267-206-7343, in the contact list of his phone under name "Redman." *Id.* at 241, 243-44.

That same day, June 19, 2010, Detective Harkins, who had kept the cell phones on his desk in the Homicide Unit, answered a phone call from Heather Warrington to the Samsung flip phone with the number 267-206-7343. N.T. Suppression Hr'g at 48-49. At that time, Warrington was a heroin user, who used the 267-206-7343 number to purchase the drug. The detective informed her he was a police officer and was investigating a homicide. Warrington subsequently met the detective at a Seven-Eleven, at which time she identified a picture of Appellant as "Jeff." N.T. Trial, 8/21/13, at 85-86. The 267-206-7343 number was stored in her phone under "Lil Jeff." *Id.* at 51, 57-58. She stated that she mostly purchased heroin from "Lil Jeff" and/or "J.R." and that she previously purchased drugs at 5513 Beaumont Street.

---

[6] Adams also identified a photograph of Clifford Jordan as "Mark."

On June 20, 2010, officers executed a search warrant for a residence at 5513 Beaumont Street and recovered, in relevant part, boxes for Cor-Bon and Remington nine-millimeter ammunition. The officers also encountered Sidi Camaras, who was renting a room at 5513 Beaumont Street. Camaras was interviewed by detectives the following day, June 21, 2010, and stated that (1) he lived at that residence for five months, (2) "Randy" lived at the house, and (3) "Fox" lived there for two months while Camaras was there. Camaras identified a picture of Appellant as "Fox." The ammunition was in the room in which "Randy" was residing.

Appellant, who was fifteen years old at the time, was charged with homicide and related offenses on June 21, 2010. His biographical information taken at the time of charging indicated Appellant's cell phone number was 267-253-1684. That number was attributed to the iPhone that Officer Krewer took from Appellant on June 17, 2010—the day of his arrest in the firearms investigation. *See* N.T. Trial, 8/27/13, at 118.

Prior to trial, Appellant filed motions seeking decertification to juvenile court and suppression of all evidence obtained from the 267-206-7343 cell phone. The trial court denied both motions and the case proceeded to a jury trial.

During trial, Appellant orally moved to preclude Byrd's statement that Appellant previously possessed, or "showed off," a .38 or .32 caliber firearm. N.T. Trial, 8/22/13, at 6, 9. The trial court ruled that Byrd would not be able

to testify regarding Appellant's possession of that weapon, but that the Commonwealth could reference Appellant's prior possession of the unrelated firearm if Appellant presented character evidence of his peacefulness. *Id.* at 12.

During the Commonwealth's case-in-chief, Byrd and Adams recanted their prior statements to police. Their prior statements were subsequently introduced as substantive evidence. As noted by the trial court:

> In the instant case, the prior inconsistent statements of Eric Adams . . . and Anthony Byrd . . . were relevant to prove that the Appellant had indeed shot [Decedent], a material fact in the case. Both Adams and Byrd had made statements to Philadelphia Police regarding a conversation they had with Appellant, wherein Appellant described the events that lead to [Decedent's] death and admitted his role therein. The statements of both Byrd and Adams described a conversation between Appellant, Adams, and Byrd, where Appellant said . . . he was going to sell heroin to someone and got into the buyer's car. He continued by saying that the buyer kept reaching down into the driver's side door, and this action made the Appellant nervous so the Appellant shot the buyer. The testimony of both witnesses at trial, varied from the written statements they had previously made to police. The statements were introduced as rebuttal testimony proof of both Adams and Byrd's prior inconsistent statements. The statement of each witness corroborated the story of [Decedent] prior to his death.
>
> After having the opportunity to review his statement to police, Byrd signed the bottom of each page and wrote the names under pictures of Bell, Adams, and Appellant. Indeed, Byrd made corrections to the written statement, even correcting the spelling of his last name and initialing next to the correction. Adams was afforded the same opportunity to review. Adams signed each page of the statement and also wrote the names of Bell, Byrd and Appellant under their pictures.

Trial Ct. Op. at 13-14.

Subsequently, Appellant's trial counsel emphasized that he would not call character witnesses due to the court's decision to allow evidence of his alleged past possession of a firearm as impeachment or rebuttal evidence. N.T. Trial, 8/27/13, at 81-82. In response, the Commonwealth noted for the record that substantial other impeachment evidence was available, stating:

> I do want to note with respect to rebuttal character, there is also a tremendous amount of information contained within the J file [referring to Appellant's juvenile record] as well as other documents that were proffered by both the Commonwealth and defense at the [de]certification motion. The Commonwealth would certainly contend, would implicate rebuttal character.

*Id.* at 83-84. The defense subsequently called its only witness, Detective Hawkins, to testify that the 267-253-1684 phone was taken from Appellant's person on June 17, 2010. The defense's questioning emphasized that there were calls between the 267-253-1684 phone, which was taken from Appellant, and the 267-206-7343 phone, which was saved in Adams's phone as "Redman," the Decedent's phone as "Jeff," and in Warrington's phone as "Lil Jeff." The defense's questioning also elicited evidence that Decedent's contact list contained the name "Red" for a different telephone number belonging to a third-party. *Id.* at 109-10.

At the close of the evidence, the trial court issued a jury charge, which included instructions on first- and third-degree murder, voluntary manslaughter, and possessing an instrument of crime. The court also

instructed the jury on self-defense and "imperfect" self-defense. N.T. Trial, 8/28/13, at 21-26. During its discussion of self-defense, the court stated that the jurors could "find malice and murder only if you are satisfied beyond a reasonable doubt that the circumstances were such that if they existed, would have justified the killing." *Id.* at 24. Appellant did not object to the court's charge.

On August 29, 2013, the jury found Appellant guilty of third-degree murder and possessing an instrument of crime. On January 17, 2014, the trial court sentenced him to fifteen to thirty years' imprisonment for third-degree murder, with no further penalty imposed for possessing an instrument of crime. Appellant's timely post-sentence motions were denied by operation of law on May 28, 2014. Appellant filed a timely notice of appeal and a court-ordered statement of errors complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b). On December 30, 2014, the court filed a responsive Rule 1925(a) opinion.

While this appeal was pending, Appellant filed two motions with this Court claiming after-discovered evidence. *See* Pa.R.Crim.P. 720(C) & cmt. As part of his motions, Appellant noted he was charged for the shooting death of Dominque Jenkins ("Jenkins case") based, in part, on Adams's statement that Appellant confessed to him over the telephone in January 2010. In October 2014, Appellant proceeded to trial in that matter, but was acquitted of murder. During the Jenkins trial, the defense cross-examined

Adams with respect to his statements that another defendant, Ricardo Harrison, confessed to shooting another person in an unrelated case ("Harrison case"). In all three cases—the instant trial, the Jenkins case, and the Harrison case—Adams gave statements that the defendants told him they shot another person when the other person reached for something.

Appellant also averred that he recently discovered a search warrant in the Jenkins case to search a "cell phone number 267-206-7343." In the affidavit of probable cause, dated June 24, 2010, the affiant indicated that "the cell phone [Appellant] was in possession of was secured by Detectives and revealed the number to be 267-206-7343." Appellant thus sought an evidentiary hearing to determine whether his phone had been "cloned," *i.e.*, whether more than one cell phone bore the same number.

This Court, in an order dated March 3, 2015, denied both motions without prejudice to Appellant's ability to raise those issues on appeal before this Panel.

On appeal, Appellant raises the following issues for our consideration.

> I. Whether the suppression court erred and denied rights guaranteed by the fourth amendment to the Constitution of the United States and Article I, Section 8 of the Pennsylvania Constitution when it denied a motion to suppress Appellant's cell phone #267-206-7343 and all evidence and information derived directly or indirectly from the warrantless search of cell phone #267-206-7343?

> II. Whether the Commonwealth suppressed evidence that could have been used to impeach the testimony of Eric Adams when it failed to disclose that Eric Adams had engaged in a pattern or practice of claiming he heard

confessions to homicides to curry favor with law enforcement?

III. Whether [this C]ourt should have remanded the case to the [trial] court for an evidentiary hearing to determine whether cell phone #267-206-7343 was discovered during the search of J.R.'s vehicle or during the search of Appellant incident to arrest, or whether the two cell phones had the same number and were evidence of cloned phones?

IV. Whether the evidence was insufficient to support the verdicts where the evidence of identity of the perpetrator was so contradictory that as a matter of law no rational jury could find guilt beyond a reasonable doubt?

V. Whether the [trial] court erred and denied due process guaranteed by the due process clause of the Fourteenth amendment when it failed to grant a judgment of acquittal on the grounds that the only evidence against Appellant was his own alleged admissions to third parties?

VI. Whether the [trial] court erred and denied due process guaranteed by the due process clause of the Fourteenth amendment when it gave an erroneous instruction on justification/self defense?

VII. Whether the [trial] court erred and denied due process guaranteed by the due process clause of the Fourteenth amendment when it ruled that if the Appellant produced character witnesses attesting to his reputation for peacefulness, then the prosecution could introduce evidence that the Appellant had been accused of possession of a[n unrelated] firearm?

Appellant's Brief at 4-5.

In his first issue, Appellant argues that the trial court erred by denying his motion to suppress all information derived from the discovery of the 267-206-7343 cell phone number. Appellant relies on the United States Supreme Court decision in *Riley v. California*, 134 S. Ct. 2473 (2014), the

- 11 -

companion case to *Riley*, *United States v. Wurie*, and this Court's subsequent decision in *Commonwealth v. Stem*, 96 A.3d 407 (Pa. Super. 2014) to assert that "the police may not open a . . . cell phone without first obtaining a search warrant for the cell phone." Appellant's Brief at 34. He argues:

> In this case, Detective Harkins testified that he opened cell phone #267-206-7343 without a search warrant, and that he powered up the phone and examined the internal and external displays. He went a step further and left the cell phone powered on so he could monitor text messages and phone calls displayed on the cell phone. Finally, he exploited the warrantless search by using the cell phone to communicate with Heather Warrington.
>
> . . . The police left the phone powered on and used information on the internal and external screen to determine the existence of and communicate with Heather Warrington.

*Id.* at 34. Thus, Appellant asserts that Detective Harkins improperly searched the phone and that all evidence obtained from Heather Warrington should have been suppressed.[7] *Id.* at 35. We find Appellant's reliance on *Riley*/*Wurie* misplaced and conclude no relief is due.

When considering the trial court's denial of a motion to suppress, this Court employs the following standard of review:

---

[7] We note that Appellant later argues that the phone did not belong to him or that others had equal access to the phone. To the extent Appellant would rely on such arguments with respect to the suppression ruling, we would conclude that Appellant failed to establish a reasonable expectation of privacy and affirm on that basis. *See Commonwealth v. Benson*, 10 A.3d 1268, 1274 (Pa. Super. 2010).

[An appellate court's] standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, [the appellate court is] bound by [those] findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of the courts below are subject to [ ] plenary review.

*Commonwealth v. Jones*, 121 A.3d 524, 526-27 (Pa. Super. 2015)

(citation omitted).

The test for determining excludability is not whether the evidence would have come to light but for the illegal actions of the police, but rather, whether the evidence "has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint."

*Commonwealth v. Butler*, 729 A.2d 1134, 1138 (Pa. Super. 1999)

(citation omitted).

Further, even if evidence is wrongfully admitted at trial,

[h]armless error exists where: (1) the error did not prejudice the defendant or the prejudice was *de minimis*; (2) the erroneously admitted evidence was merely cumulative of other untainted evidence which was

- 13 -

substantially similar to the erroneously admitted evidence; or (3) the properly admitted and uncontradicted evidence of guilt was so overwhelming and the prejudicial effect of the error was so insignificant by comparison that the error could not have contributed to the verdict.

*Commonwealth v. Hutchinson*, 811 A.2d 556, 561 (Pa. 2002) (citations omitted); *see also Commonwealth v. Hoffman*, 589 A.2d 737, 745 (Pa. Super. 1991) (applying harmless error standard to admission of "suppressible" statement by defendant to police officer).

Instantly, Appellant muddles several constitutional principles, but relies upon a single theory for relief, namely, that the detective improperly **searched** his phone to obtain evidence. This Court, in *Stem*, summarized the principles relevant to this claim.

> The Court[, in *Riley*/*Wurie*,] began its analysis with a discussion of the well-settled history and parameters of the search incident to an arrest exception to the warrant requirement. The Court explained that the exception permits an arresting officer without a warrant to search an arrestee's person and the area within his immediate control only for personal property immediately associated with the arrestee. The Court reiterated the well-established dual bases that justify the exception: ensuring police safety and preventing the destruction of evidence.
>
> The Court proceeded to consider "how the search incident to arrest doctrine applies to modern cell phones, which are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of human anatomy." The Court held that the doctrine cannot be extended to such devices, and held "instead that officers must generally secure a warrant before conducting such a search."
>
> \* \* \*

- 14 -

Having determined that searching cellular telephones after an arrest does not satisfy the traditional dual bases underlying the search incident to arrest exception, the Court turned its attention to the governments' argument that searching a cellphone is materially indistinguishable from seizing and searching items incident to arrest that contain the same information as the data stored on a cellular telephone, but in physical form. For instance, a police officer may search a woman's purse incident to arrest and, for example, review the contents of a date book that includes phone numbers and addresses. The United States argued that, in this type of scenario, the phone number directory in a cellular device should not be considered different from the date book in the woman's purse, and, therefore, should be susceptible to a search incident to arrest. In response, the Court stated that this argument is "like saying riding on horseback is materially indistinguishable from a flight to the moon. Both are ways of getting from point A to point B, but little else justifies lumping them together."

The Court, in large part, focused upon the interplay between modern day cellular devices and the privacy interests of the arrestee. The Court's discussion on this essential point, in relevant part, follows:

> Modern cell phones, as a category, implicate privacy concerns far beyond those implicated by the search of a cigarette pack, a wallet, or a purse. A conclusion that inspecting the contents of an arrestee's pockets works no substantial additional intrusion on privacy beyond the arrest itself may make sense as applied to physical items, but any extension of that reasoning to digital data has to rest on its own bottom.

> Cell phones differ in both a quantitative and a qualitative sense from other objects that might be kept on an arrestee's person. The term "cell phone" is itself misleading shorthand; many of these devices are in fact minicomputers that also happen to have the capacity to be used as a telephone. They could just as easily be called cameras, video players,

- 15 -

rolodexes, calendars, tape recorders, libraries, diaries, albums, televisions, maps, or newspapers.

One of the most notable distinguishing features of modern cell phones is their immense storage capacity. . . . The storage capacity of cell phones has several interrelated consequences for privacy. First, a cell phone collects in one place many distinct types of information—an address, a note, a prescription, a bank statement, a video—that reveal much more in combination than any isolated record. Second, a cell phone's capacity allows even just one type of information to convey far more than previously possible. The sum of an individual's private life can be reconstructed through a thousand photographs, labeled with dates, locations, and descriptions; the same cannot be said of a photograph or two of loved ones tucked into a wallet. Third, the data on a phone can date back to the purchase of the phone, or even earlier. A person might carry in his pocket a slip of paper reminding him to call Mr. Jones; he would not carry a record of all his communications with Mr. Jones for the past several months, as would routinely be kept on a phone.

Finally, there is an element of pervasiveness that characterizes cell phones but not physical records. Prior to the digital age, people did not typically carry a cache of sensitive personal information with them as they went about their day. Now it is the person who is not carrying a cell phone, with all that it contains, who is the exception. . . . [I]t is no exaggeration to say that many of the more than 90% of American adults who own a cell phone keep on their person a digital record of nearly every aspect of their lives—from the mundane to the intimate. Allowing police to scrutinize such records on a routine basis is quite different from allowing them to search a personal item or two in the occasional case.

Although the data stored on a cell phone is distinguished from physical records, by quantity

alone, certain types of data are also qualitatively different. An Internet search and browsing history, for example, can be found on an Internet-enabled phone and could reveal an individual's private interests or concerns—perhaps a search for certain symptoms of disease, coupled with frequent visits to WebMD. Data on a cell phone can also reveal where a person has been.

\* \* \*

Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life." The fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought. Our answer to the question of what police must do before searching a cell phone seized incident to an arrest is accordingly simple—get a warrant.

**Stem**, 96 A.3d at 410-414 (citations omitted).

In **Riley**, the search consisted of the following:

The officer accessed information on the phone and noticed that some words (presumably in text messages or a contact list) were preceded by the letters "CK"—a label that, he believed, stood for "Crip Killers," a slang term for members of the Bloods gang.

At the police station about two hours after the arrest, a detective specializing in gangs further examined the contents of the phone. The detective testified that he "went through" Riley's phone "looking for evidence, because . . . gang members will often video themselves with guns or take pictures of themselves with guns." Although there was "a lot of stuff" on the phone, particular files that "caught [the detective's] eye" included videos of young men sparring while someone yelled encouragement using the moniker "Blood." The police also found photographs of Riley standing in front of a car they

suspected had been involved in a shooting a few weeks earlier.

*Riley*, 134 S. Ct. at 2480-81.

In *Wurie*, as summarized in *Stem*,

> Wurie received repeated calls from "my house," which was displayed on the phone's external display screen.[8] The police opened the phone and observed a photograph of a woman and a baby on the phone's "wallpaper." The police then pressed a button to access the phone's call log, and, from there, was able to push other buttons to determine the phone number associated with the moniker "my house." The police then used an online phone directory to trace the number to an apartment building, for which police later obtained and executed a search warrant. During the search of Wurie's apartment, the police recovered crack cocaine, marijuana, drug paraphernalia, a firearm with ammunition, and United States currency.

*Stem*, 96 A.3d at 410 (discussing *Riley*, 134 S. Ct. at 2481).

Lastly, in *Stem*, the defendant was placed in custody for criminal trespass after which,

> [the arresting officer] inspected [Stem's] cell phone. [Stem] was under arrest prior to the [officer] turning on the phone and searching the cell phone data. The cell phone photos are not immediately displayed when the cell phone is turned on. To the contrary, the picture data must be accessed by proactively opening it. In order to do so, the picture icon must be touched. In the instant case, [the officer] accessed the picture data by hitting the picture icon.

> When [the officer] accessed the picture data on Stem's cellular telephone, the officer uncovered what appeared to be a photograph depicting child pornography. Based upon

---

[8] We note that *Riley* involved a search of a "smart" phone," while *Wurie* involved a search of a flip, or "simple" phone.

> this discovery, [the officer] applied for, and received, a search warrant that, when executed, revealed a total of seventeen photographs depicting child pornography.

*Id.* at 408 (citation omitted).

In the case *sub judice*, the extent of the specific intrusion complained of was minimal compared to **Riley**, **Wurie**, and **Stem**. The detective powered up the phone and although he "searched" the phone's data for the number associated with it, he accessed no additional information or data on the phone. In contrast to **Wurie**, the discovery of Warrington's existence was not the product of a search of the call logs or other information contained on the phone. Rather, the detective answered the phone, which had been on his desk.

Even if we did conclude that Detective Harkins engaged in an illegal warrantless search of Appellant's phone and the evidence thereby obtained, including the testimony of Warrington who the detective encountered via the cell phone at issue, should have been suppressed, we hold that the admission of this evidence constituted harmless error. Appellant did not deny ownership of the phone identified as 267-206-7343, and that number was listed in the Decedent's phone under "Jeff." In a dying declaration, Decedent identified "Jeff" as his assailant. Additionally, two witnesses submitted statements detailing Appellant's confession to a shooting that was substantially similar to that described by Decedent. Both witnesses identified Appellant by his picture. Thus, in light of the other properly

admitted evidence, we conclude that even if the trial court erred by failing to suppress, the admission of Warrington's testimony was harmless and not a basis for reversal. Accordingly, Appellant's first issue lacks merit.

Appellant's second and third issues concern alleged after-discovered evidence, which was the subject of two separate Rule 720(C) motions filed by Appellant during the pendency of this appeal. In his second issue, Appellant argues that he did not discover, until after his trial, that Adams, whose prior inconsistent statements regarding Appellant's confession was admitted at trial, gave similar statements in the Jenkins case and the Harrison case. Appellant's Brief at 37-39. Appellant avers that he did not discover this information until the Jenkins case went to trial in October 2014. Appellant further claims that had he known about the third confession Adams proffered in the Harrison case, he could have impeached Adams as a "vending machine" of confession testimony. *Id.* at 6. Appellant emphasizes that he used such impeachment evidence in the Jenkins case and was acquitted of murder in that case. *Id.* at 41. Appellant thus contends that the Commonwealth's failure to reveal the information that Adams was a "useful confession witness" constituted a ***Brady***[9] violation. *Id.* at 39-41.

In his third issue, Appellant argues that the Commonwealth failed to disclose that the phone seized from Appellant by Officer Krewer also had the number 267-206-7343. *Id.* at 41. Appellant contends that this information

_____

[9] ***See Brady v. Maryland***, 373 U.S. 83 (1963).

was material because that same number was attributed to the phone recovered from the Mercury Marquis and used to identify him as the shooter. *Id.*

Preliminarily, we note that Appellant's brief focuses on his right to a new trial based on the suppression of evidence by the Commonwealth. However, interrelated with this claim are his petitions for remand based on after-discovered evidence for hearing to develop these claims. We address Appellant's **Brady** and after-discovered evidence claims *seriatim*, but conclude neither warrants relief.

It is well settled:

> Under **Brady**, the prosecution's failure to divulge exculpatory evidence is a violation of a defendant's Fourteenth Amendment due process rights. A **Brady** claim challenges the Commonwealth's failure to produce material evidence. Specifically, [the defendant] must plead and prove that "(1) the prosecutor has suppressed evidence; (2) the evidence, whether exculpatory or impeaching, is helpful to the defendant; and (3) the suppression prejudiced the defendant." The defendant bears the burden of demonstrating that the Commonwealth withheld or suppressed evidence.

**Commonwealth v. Smith**, 17 A.3d 873, 887-88 (Pa. 2011) (citations omitted).

> Pursuant to **Brady** and its progeny, the prosecutor has a duty to learn of all evidence that is favorable to the accused which is known by others acting on the government's behalf in the case, including the police. Pursuant to [**Kyles v. Whitley**, 514 U.S. 419 (1995)], "the prosecutor's **Brady** obligation clearly extends to exculpatory evidence in the files of police agencies of the same government bringing the prosecution." Moreover,

there is no ***Brady*** violation when the defense has equal access to the allegedly withheld evidence.

***Commonwealth v. Weiss***, 81 A.3d 767, 783 (Pa. 2013) (citations omitted). Moreover,

> "[t]o satisfy the prejudice inquiry, the evidence suppressed must have been material to guilt or punishment." . . . [M]ateriality extends to evidence affecting the credibility of witnesses, rather than merely to purely exculpatory evidence. Moreover, . . . the protection of ***Brady*** extends to the defendant's ability to investigate alternate defense theories and to formulate trial strategy. "[F]avorable evidence is material, and constitutional error results from its suppression by the government, if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."

***Commonwealth v. Ly***, 980 A.2d 61, 76 (Pa. 2009) (citations omitted).

As to after-discovered evidence, a claim for a new trial must be raised promptly in a Pa.R.Crim.P. 720(C) motion, and if the evidence is obtained during the direct appeal, the motion should include a request for a remand to the trial court. ***Commonwealth v. Perrin***, 108 A.3d 50, 51 (Pa. Super. 2015). In order to obtain relief based on after-discovered evidence, the defendant must demonstrate that the after-discovered evidence:

> (1) could not have been obtained prior to trial by exercising reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach a witness's credibility; and (4) would likely result in a different verdict.

***Commonwealth v. Castro***, 93 A.3d 818, 821 n.7 (Pa. 2014).

Although a defendant need not produce an affidavit from a witness to be entitled to a hearing on an after-discovered evidence claim, he must establish the alleged after-discovered evidence is producible and admissible. *Id.* at 825, 827. After-discovered evidence to be used solely to impeach the credibility of a witness does not constitute grounds for a new trial. ***See Commonwealth v. Pagan***, 950 A.2d 270, 292 (Pa. 2008). Conclusory accusations alone are insufficient to warrant an evidentiary hearing pursuant to Rule 720(C). ***Castro***, 93 A.3d at 827. Further, the purpose of an evidentiary hearing is not a fishing expedition to discover evidence. *Id.* at 827-28.

In the case sub *judice*, Appellant presents no meaningful argument that the Commonwealth suppressed the alleged evidence, that is, Adams's status as a "useful confession witness," or the phone numbers attributed to the phones taken from Appellant by Krewer and from the Mercury Marquis. Appellant apparently had equal access to such information as he was able to impeach Adams in the Jenkins case using information regarding the Harrison case. Furthermore, Appellant's contention that the cell phone seized from him by Officer Krewer bore the same number as the phone recovered from the Mercury Marquis arose out of a June 24, 2010 affidavit of probable cause for a search warrant in the Jenkins case. Thus, Appellant has not established that the Commonwealth suppressed the evidence. ***See Weiss***, 81 A.3d at 783.

Furthermore, we discern no basis upon which to conclude that the evidence was material or that the failure to disclose the information was prejudicial. *See Ly*, 980 A.2d at 76. Instantly, Adams's prior inconsistent statement was wholly corroborated by Byrd. Appellant's suggestion that the two phones bore the number 267-206-7343 connected to the murder was belied by the trial record in this case in which the 267-206-7343 number was attributed to the Samsung "flip" phone recovered from the Mercury Marquis, and the 267-253-1684 number was attributed to the iPhone recovered from Appellant's person.[10]

Our review further reveals no basis for a remand in light of Appellant's Pa.R.Crim.P. 720(C) motions. The sole purpose of the after-discovered evidence based on Adams's testimony in the Jenkins trial would be for impeachment. Accordingly, Appellant has not met the second prong of the after-discovered evidence test and we discern no basis to remand this matter for further development of the record. *See Pagan*, 950 A.2d at 270. Appellant's contention that his phone might have been "cloned" fails to raise a genuine issue of material fact that a new trial is required. Appellant ostensibly should have known the number of the phone seized from his person and the phone number of the phone used as primary evidence during his trial. He also fails to assert how such evidence could not have been

---

[10] As noted above, Appellant attempted to sow doubt that he possessed the 267-206-7343 phone because phone records revealed there were several calls between that number and his 267-253-1684 number.

discovered before the trial. Accordingly, Appellant's second and third issues do not warrant relief.

In his fourth and fifth issues, Appellant challenges the sufficiency of the evidence. Specifically, in his fourth issue, Appellant claims that his conviction was based upon speculation and inconsistent evidence regarding his identity as the shooter. Appellant's Brief at 44-47. He emphasizes inconsistencies in the evidence, including Decedent's statement that the shooter reached through the window, Byrd's and Adams's prior statements that Appellant stated he was inside the car when he fired, and that Appellant was not known as "Jeff." *Id.* He further contends that the Commonwealth did not adduce evidence the 267-206-7343 phone "belonged" to him or that he had sole access to the phone. *Id.* at 46. He insists that the "there was a lot more evidence against J.R. than there was against [him]." *Id.* Appellant highlights that the ammunition used to kill Decedent was consistent with that found at Bell's residence and Warrington testified Bell would also answer the 267-206-7343 phone.

In issue five, Appellant presents the generalized argument that sufficient evidence did not support his out-of-court confessions to Adams and Byrd. He cites only to *Opper v. United States*, 348 U.S. 84 (1954), for the general proposition that out-of-court admissions must be supported by sufficient evidence.

Our standard of review regarding a sufficiency of the evidence claim is as follows:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying the above test, we may not weigh the evidence and substitute our judgment for [that of] the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Vargas*, 108 A.3d 858, 867-68 (Pa. Super. 2014) (citations omitted), *appeal denied*, 121 A.3d 496 (Pa. 2015).

Moreover, the Pennsylvania Supreme Court has summarized the following view of the role of prior inconsistent statements for substantive purposes:

> In sum, then, our review of authority from the United States Supreme Court and our Court, as well as our consideration of jurisprudence from other states which reject a *per se* rule, coupled with our over quarter-century of experience with the use of prior inconsistent statements as substantive evidence by the courts of this Commonwealth, convinces us that criminal convictions

- 26 -

which rest only on prior inconsistent statements of witnesses who testify at trial do not constitute a deprivation of a defendant's right to due process of law, as long as the prior inconsistent statements, taken as a whole, establish every element of the offense charged beyond a reasonable doubt, and the finder-of-fact could reasonably have relied upon them in arriving at its decision. Prior inconsistent statements, which meet the requirements for admissibility under Pennsylvania law,[ ] must, therefore, be considered by a reviewing court in the same manner as any other type of validly admitted evidence when determining if sufficient evidence exists to sustain a criminal conviction.

***Commonwealth v. Brown***, 52 A.3d 1139, 1170-71 (Pa. 2012).

In this case, ample evidence was presented to establish that Appellant was the individual known as "Jeff" who shot Decedent. Two witnesses, Adams and Byrd, gave contemporaneously recorded and signed statements that Appellant had confessed to a shooting within the same time frame and location as the Decedent's shooting. Decedent called Appellant's admitted phone number, 267-206-7343, six times shortly before being shot and listed that number under the name "Jeff." In a dying declaration, Decedent indicated that "Jeff" had shot him. Warrington testified that she frequently bought heroin from Appellant, whom she knew as "Lil Jeff," and identified Appellant's picture as "Jeff." We emphasize that the evidence produced by the Commonwealth need not preclude every possibility of innocence and the fact finder is free to believe all, part, or none of the evidence. ***See Vargas,*** 108 A.3d at 867-68. Accordingly, viewing all the evidence admitted at trial in the light most favorable to the Commonwealth, as the verdict winner, we

conclude that sufficient evidence corroborated Adam's and Byrd's confessional evidence and supported Appellant's conviction. *See id.*; *Brown*, 52 A.3d at 1170-71. Therefore, Appellant's fourth and fifth issues also fail.

Turning to Appellant's sixth issue, he contends that the trial court erred by issuing an incorrect jury instruction. Appellant points to an isolated passage in the transcript which indicates that the trial court omitted the word "not" when describing malice/murder and justification. Appellant's Brief at 50; *see also* N.T. Trial, 8/28/13, at 24.

As a prefatory matter, we consider whether Appellant has preserved his challenge to the trial court's jury instruction. It is axiomatic that to preserve such an issue for appellate review, a "[s]pecific exception shall be taken to the language or omission complained of." Pa.R.A.P. 302(b). Similarly, our Rules of Criminal Procedure explicitly declare: "[n]o portions of the charge nor omissions from the charge may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate." Pa.R.Crim.P. 647(B).

Our Supreme Court has opined:

> The pertinent rules, therefore, require a specific objection to the charge or an exception to the trial court's ruling on a proposed point to preserve an issue involving a jury instruction. Although obligating counsel to take this additional step where a specific point for charge has been rejected may appear counterintuitive, as the requested instruction can be viewed as alerting the trial court to a defendant's substantive legal position, it serves the

> salutary purpose of affording the court an opportunity to avoid or remediate potential error, thereby eliminating the need for appellate review of an otherwise correctable issue.

*Commonwealth v. Pressley*, 887 A.2d 220, 224 (Pa. 2005) (citation and footnotes omitted).

In the instant case, at the conclusion of the charge to the jury, neither counsel noted any objections and therefore the trial court had no opportunity to remediate any potential error. N.T., 8/28/13, at 39. Thus, Appellant has waived this issue for failing to object before the jury retired to deliberate. *See* Pa.R.A.P. 302(b); Pa.R.Crim.P. 647(B); *Pressley*, 887 A.2d at 224.

In his final issue, Appellant argues that the trial court erred by ruling that the Commonwealth could introduce evidence of Appellant's alleged previous possession of a firearm for purposes of impeachment if Appellant produced character witnesses attesting to his "peacefulness" at trial. Appellant asserts that this decision caused him to forgo any character testimony regarding his peaceful nature. He contends that the trial court should have prohibited any mention of his alleged prior possession of a firearm pursuant to *Commonwealth v. Morgan*, 739 A.2d 1033, 1038 (Pa. 1999) (holding that character witnesses may not be cross-examined with prior bad acts not resulting in convictions).

"It is well-settled that the scope of cross examination is a matter within the trial court's discretion and will not be disturbed by this Court

absent an abuse of that discretion." ***Commonwealth v. Kouma***, 53 A.3d 760, 768 (Pa. Super. 2012) (citation and punctuation omitted). When examining the admission or exclusion of impeachment evidence in the context of character witnesses we specifically note:

> In a criminal case, the defendant may offer character witnesses to testify as to that defendant's reputation in the community regarding a relevant character trait. ***See*** Pa.R.E. 404(a)(1); 405(a). Of course, the Commonwealth may attempt to impeach those witnesses. ***Commonwealth v. Hoover***, 16 A.3d 1148, 1149 (Pa. Super. 2011) (citing ***Commonwealth v. Morgan***, 559 Pa. 248, 739 A.2d 1033, 1035 (1999)). "For example, when cross-examining character witnesses offered by the accused, the Commonwealth may test the witnesses' knowledge about specific instances of conduct of the accused where those instances are probative of the traits in question." ***Hoover***, 16 A.3d at 1149-50 (citing Pa.R.E. 405(a)). However, the Commonwealth's right to cross-examine character witnesses is not unlimited: the Commonwealth may not cross-examine a character witness about a defendant's uncharged criminal allegations, ***Morgan***, 739 A.2d at 1035-36, or a defendant's arrests that did not lead to convictions. ***Commonwealth v. Scott***, 496 Pa. 188, 436 A.2d 607, 611-12 (1981).

***Commonwealth v. Kuder***, 62 A.3d 1038, 1057-58 (Pa. Super. 2013).

We acknowledge that "evidence of good character is to be regarded as evidence of substantive fact just as any other evidence tending to establish innocence and may be considered by the jury in connection with all of the evidence presented in the case on the general issue of guilt." ***Commonwealth v. Luther***, 463 A.2d 1073, 1077 (Pa. Super. 1983). However, a trial court's ruling, which results in the defendant's decision to

not call character witnesses to testify regarding the defendant's reputation, may constitute harmless error where the evidence of guilt is overwhelming. *Kouma*, 53 A.3d at 770-71. In addition, "[w]hen discussing harmless error, we have also stated that the Commonwealth can meet its burden of showing harmlessness by persuading us the error did not prejudice the appellant or did so to a *de minimis* extent[.]" *Hoover*, 16 A.3d at 1150 (citation omitted).

In the case *sub judice,* Appellant narrowly focuses on the trial court's decision to allow evidence of Appellant's alleged prior possession of a firearm to impeach any hypothetical character witness which Appellant could have presented. However, as the Commonwealth noted for the record at trial, significant other evidence was available for impeachment purposes, including a certified juvenile adjudication for terroristic threats and simple assault. N.T. Trial, 8/27/13, at 83-83. Accordingly, we hold that any error that the trial court committed by allowing evidence of an alleged prior "bad act" to impeach hypothetical character witnesses was *de minimis,* and therefore harmless*,* in light of the other evidence available for impeachment purposes. *See Hoover*, 16 A.3d at 1150. Further, given the overwhelming evidence supporting Appellant's conviction, as discussed *supra*, we conclude that any error which caused Appellant to decline to call character witnesses was

harmless.[11]  ***See Kouma***, 53 A.3d at 771.  Thus, Appellant's seventh issue merits no relief and does not require reversal.  Accordingly, we affirm Appellant's judgment of sentence.

Judgment of sentence affirmed.

Mundy, J. joins this Memorandum.  Jenkins, J. Concurs in the Result.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/27/2016

---

[11]  We also note that Appellant did not identify his possible character witnesses at trial, and did not do so in his appellate brief.